UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAMES BROWN,

           Plaintiff,

    v.                                             **DECISION AND ORDER**
                                                     11-CV-1023S

BETH CADE, N. SHARP, DR. JADOW RAO,
and R. KILLINGER,

           Defendants.

## I. INTRODUCTION

In this action, pro se plaintiff James Brown alleges, pursuant to 42 U.S.C. § 1983,

that Defendants Beth Cade, Karen Sharp, Dr. Jadow Rao, and Rosalyn Killinger acted with

deliberate indifference to his medical needs, in violation of his Eighth Amendment rights,

all while Brown was an inmate in the custody of the New York Department of Corrections

and Community Services ("DOCCS") at the Attica Correctional Facility ("Attica").

Presently before this Court is Defendants' Motion for Summary Judgment, which

Brown opposes. (Docket No. 34.)  For the following reasons, Defendants' motion is

granted.

## II. BACKGROUND

At all times relevant, Brown was an inmate at Attica, where he received treatment

for a number of medical conditions.  (Defendants' Statement of Undisputed Facts

("Defendants' Statement"), Docket No. 34-1, ¶ 1.)  Defendant Dr. Jadow Rao was a

medical doctor at Attica. (Defendants' Statement, ¶ 2.) Defendants Rosalyn Killinger, Beth

Cade, and Karen Sharp were registered nurses at Attica. (Defendants' Statement, ¶¶ 3-5.)

Brown's claims involve Defendants' treatment of his hepatitis C and the dispensing

of medicine to treat his back and leg pain.

## A.      Hepatitis C Treatment

Brown arrived at Attica in 2005 with a previously diagnosed Hepatitis C condition that was asymptomatic.  (Defendants' Statement, ¶¶ 9, 11, 13.)  Brown had previously been informed that he was not a candidate for Hepatitis C treatment, and before arriving at Attica, he had received no treatment.  (Defendants' Statement, ¶¶ 10, 12.)

When Brown arrived at Attica, he was told that his Hepatitis C did not require treatment, a diagnosis that Defendant Rao confirmed in 2007.  (Defendants' Statement, ¶¶ 14-16.)  Rather, Defendant Rao told Brown that he would continue to monitor his liver status, which he did, ordering a liver biopsy that took place on May 7, 2007.  (Defendants' Statement, ¶¶ 17-18.)  The biopsy revealed the presence of chronic liver disease. (Defendants' Statement, ¶ 20.)

Two years later, on May 19, 2009, test results indicated that Brown had elevated liver enzyme levels and an increased viral load.  (Defendants' Statement, ¶ 57.)  On follow up in October 2009, Defendant Rao determined that Brown was not a candidate for Hepatitis C treatment because of his elevated liver enzyme levels.   (Defendants' Statement, ¶ 88.)   Medical staff thereafter continued to monitor Brown's condition, including on April 12, 2010, when a physician's assistant again noted that treatment was not indicated and monitoring would continue.  (Defendants' Statement, ¶ 103.)  At no time thereafter did Brown's liver enzyme or viral load test results indicate that treatment was necessary.  (Defendants' Statement, ¶ 123.)

**B.     Dispensing of Ultram**

Along with Hepatitis C, Brown arrived at Attica with back and leg pain, which he had

been more or less experiencing since the 1990s, and which stemmed from his diagnosed

degenerative disc disease.  (Defendants' Statement, ¶¶ 21-24.)  Brown had taken a host

of pain medications at different correctional facilities, including Flexural, Naprosyn, and

Tylenol. (Defendants' Statement, ¶ 25.) Between 2005 and 2008, Brown had occasionally

been prescribed Ultram, an addictive pain medication. (Defendants' Statement, ¶¶ 26, 27.)

On December 1, 2008, Brown was waiting in line to receive his Ultram from

Defendant Cade when another inmate passed Brown two pills wrapped in cellophane.

(Defendants' Statement, ¶ 29-31.)  When Brown was searched on his way back into the

housing unit, the corrections officer discovered the two pills and informed Defendant Cade

that Brown had been caught with them.  (Defendants' Statement, ¶¶ 32, 33.)  Defendant

Cade identified the two pills as Ultram.  (Defendants' Statement, ¶ 34.)  After a Misbehavior

Report was filed against Brown, he pled guilty to drug possession and was found guilty of

unauthorized medication and smuggling.  (Defendants' Statement, ¶¶ 35-37.)

The day after this incident, Defendant Rao discontinued Ultram for Brown, after

Defendant Cade informed him that Brown had been caught with the pills in his possession.

(Defendants' Statement, ¶¶ 38, 39.)  Cade maintains that she told Rao about the incident

so that he would know Brown was not taking his medication as prescribed; Brown contends

that Cade informed Rao specifically so that he would discontinue his Ultram.  (Defendants'

Statement, ¶¶ 40, 41.) Rao maintains that he discontinued Ultram because Brown was not

taking it, and instead, was hoarding or selling it.   (Defendants' Statement, ¶ 45.)

Brown, however, specifically wanted Ultram, which, as noted, is an addictive pain

medication.  (Defendants' Statement, ¶ 27.)  Ultram, however, was contraindicated due to Brown's liver condition.  (Defendants' Statement, ¶¶ 58, 84, 95, 128.)  Even so, Brown claimed that he could not take other pain medications, such as Motrin, Advil, and Tylenol, because they upset his stomach and made him bleed.  (Defendants' Statement, ¶ 52.)  In addition, Brown walked out of or refused treatment on numerous occasions.  (Defendants' Statement, ¶¶ 19, 53, 55, 60, 67, 68, 114.)

Nonetheless, Brown repeatedly sought Ultram and refused other pain medications. (Defendants' Statement, ¶¶ 51 (refusing Motrin on January 6, 2009), 90, 92, 98.)  On July 17, 2009, Brown saw Dr. Evans, who prescribed Ultram for 21 days to be administered in crushed form.  (Defendants' Statement, ¶ 62.)  Six days into the course of treatment, Brown complained that Ultram in its crushed form upset his stomach and made him vomit. (Defendants' Statement, ¶ 63.)  Brown thereafter refused Ultram in its crushed form on several occasions.   (Defendants' Statement, ¶¶ 67, 68.)

Dr. Evans changed Brown's Ultram prescription to 50 mg twice per day on August 7, 2009, but Defendant Rao then discontinued Ultram altogether two days later due to Brown's liver issues.  (Defendants' Statement, ¶¶ 72, 76.)  But Brown persists in his belief that Defendant Rao discontinued Ultram because Defendant Cade told him that he (Brown) was hoarding the pills.  (Defendants' Statement, ¶¶ 77, 82.)

Brown sought Ultram again on January 4, 2010, when he saw a nurse practitioner for his complaints of pain and told her that he could only take Ultram due to his liver condition.  (Defendants' Statement, ¶ 92.)  The nurse practitioner declined to prescribe Ultram and instead encouraged Brown to use his TENS unit and back brace.  (Defendants' Statement, ¶ 92.)

**C.      Pain Treatment**

In addition to the Ultram that Brown was periodically prescribed, he also received other forms of treatment for his back and leg pain.  He repeatedly saw doctors and other medical staff, often times several times per month.  (Defendants' Statement, ¶¶ 50, 53, 54, 55, 56, 57, 60, 61, 62, 72, 83, 84, 86, 88, 89, 90, 91, 92, 93, 97, 98, 102, 103, 104.)  He also underwent various diagnostic tests, including full blood panel, CT scan, MRI, and outside medical consultations.   (Defendants' Statement, ¶¶ 93, 116, 117, 118.)  Brown also received multiple treatments for his pain, including a TENS unit, physical therapy, a back brace, as well as accommodations, such as a double mattress and a feed-in-cell order to eliminate having to walk to the mess hall.  (Defendants' Statement, ¶¶ 49, 59, 87, 88, 92, 104, 105, 106.)

## III. DISCUSSION

Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Since Brown is proceeding pro se, this Court has considered his submissions and arguments accordingly.

Brown has four surviving causes of action, which assert that Defendants intentionally denied him medical treatment in violation of his Eighth Amendment rights.[1] First, Brown alleges that Defendant Cade interfered with his medical treatment plan by

---

[1]Brown's fifth cause of action and part of his fourth cause of action were dismissed by the court on March 29, 2013.  (Docket No. 9.)

discontinuing his medication and/or influencing Defendant Rao to discontinue his medication because he had been hoarding or selling it.   Second, Brown alleges that Defendant Sharp refused to give him his medication on several occasions, told lies to get his medication discontinued, and had his double mattress and TENS unit taken away from him.   In his third cause of action, Brown alleges that Defendant Rao refused to treat his Hepatitis C and discontinued his pain medication.   And in what survives of his fourth cause of action, Brown alleges that Defendant Killinger interfered with his medical treatment plan by telling Defendant Rao that Defendants Cade and Sharp had previously noted that he was hoarding or selling his medication.

Defendants seek summary judgment on each of Brown's causes of action.

## A.   Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is "material" if it "might affect the outcome of the suit under the governing law."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).   An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."   Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).   "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."   Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).   The function of the court is not "to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the nonmoving party.  Anderson, 477 U.S. at 252.

**B.    42 U.S.C. § 1983**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  See 42 U.S.C. § 1983.  On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)).  Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged.  See Baker, 443 U.S. at 140.  Here, Brown's claims are grounded in the Eighth Amendment.

**C.       Brown's Claims**

Brown maintains that Defendants were deliberately indifferent to his medical needs by denying him pain medication (Ultram), refusing to treat his Hepatitis C, and interfering with his prescribed medical treatment.

The Eighth Amendment, which applies to the States through the Fourteenth Amendment, "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); U.S. Const. amend. VIII.  As such, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment.  See DeShaney v. Winnebago County Dept. of Social Svcs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005-1006, 103 L.Ed.2d 249 (1989).

In addition, the Supreme Court has recognized that a prisoner's claim that he was intentionally denied medical treatment is cognizable under the Eighth Amendment and § 1983:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.
>
> . . .
>
> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend evolving standards of decency in

violation of the Eighth Amendment.

Estelle v. Gamble, 429 U.S. 97, 104, 106, 97 S.Ct. 285, 291, 292, 50 L.Ed.2d 25 (1976)(quotations and citations omitted).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (citing Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)). With respect to a claim of deliberate indifference to a serious medical need, a prisoner must show that he suffered from a "sufficiently serious" medical condition, see Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), and that the defendants acted with a "sufficiently culpable state of mind," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

The subjective component "requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Sims, 230 F.3d at 21 (citations omitted). The objective component is "contextual and responsive to contemporary standards of decency." Id. (quoting Hudson, 503 U.S. at 8).

> "An official acts with the requisite deliberate indifference when
> he 'knows of and disregards an excessive risk to inmate health
> or safety; the official must be both aware of facts from which
> the inference could be drawn that a substantial risk of serious
> harm exists, and he must also draw the inference.'"

Brown v. Picarelli, No. 96 Civ. 1222, 2003 WL 1906180, at *6 (S.D.N.Y. Apr. 15, 2003)(quoting Farmer, 511 U.S. at 837).

Boiled to its essence, at issue here is Brown's unhappiness about having his Ultram

prescription discontinued.  It is undisputed, however, that Brown was caught secreting

Ultram pills—whether his or someone else's is immaterial—on December 8, 2008.  That

information was relayed to Defendant Rao, who quite reasonably discontinued Ultram, both

for institutional security concerns and because it was contraindicated for Brown's liver

condition.  The relaying of this information to Defendant Rao by the other defendants is

also quite reasonable since Defendant Rao, as Brown's physician, must be aware of all

information relevant to Brown's treatment.  More to the point, there is no evidence

suggesting that Defendants Cade, Sharp, and Killinger relayed this information to

Defendant Rao specifically to interfere with Brown's medical treatment, to the exclusion of

other legitimate reasons.

It is further undisputed that Brown engaged in behavior that Defendant Rao, through

his education, training, and experience, recognized as drug-seeking behavior: refusing

other pain medicine and treatment; refusing crushed Ultram; claiming side effects that were

not medically indicated; insisting on Ultram in pill form.  In addition, evidence in the record

demonstrates that Brown was offered and received other forms of treatment for his pain,

including other pain medications, Ultram in crushed form, physical therapy, a TENS unit,

back brace, and double mattress.  Based on these undisputed facts, which establish

legitimate reasons for Defendants' refusal to provide Brown with Ultram in pill form, Brown

is unable to establish that Defendants acted with wantonness or an otherwise sufficiently

culpable state of mind in treating his pain.  His claim therefore fails.

The same holds true for Defendant Rao's treatment of Brown's Hepatitis C.

Although Brown insists that Defendant Rao failed to treat him, he has come forth with no

evidence that his Hepatitis C required treatment.  Rather, the undisputed record

demonstrates that Defendant Rao assessed Brown's condition, ordered medical tests, and determined, in his professional judgment, that Brown was not a candidate for treatment. Moreover, Defendant Rao and other medical staff continued to monitor Brown's Hepatitis C and re-evaluate his candidacy for treatment. That treatment was not medically indicated does not equate to deliberate indifference to a serious medical need. Brown's claim therefore fails.

Further, although it is clear from the record that Brown wanted Ultram in pill form to treat his pain and wanted some sort of treatment for his Hepatitis C, treatment decisions are not Brown's to make, and his disagreement with his treatment regiment is insufficient to state a constitutional claim. See Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that the prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.") Consequently, because Brown's disagreement with Defendants' treatment of his Hepatitis C and pain does not support an Eighth Amendment claim, Defendants are entitled to summary judgment.

Finally, Defendants vigorously dispute Brown's claims that he was denied medication and his TENS unit and double mattress were taken from him on certain occasions, but even if true, these allegations do not support a claim under the Eighth Amendment, because such de minimis deprivations are not objectively sufficiently serious to state a claim under the Eighth Amendment, particularly in light of the undisputed evidence that Brown walked out of treatment and refused to accept medication several times. Thus, these claims also fail.

## IV. CONCLUSION

Brown has failed to establish the existence of any disputed issues of material fact as it relates to Defendants' subjective intent in the treatment of his medical conditions, which is fatal to each of his Eighth Amendment claims.  Defendants' motion for summary judgment will therefore be granted in its entirety.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 34) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated:      October 16, 2016
            Buffalo, New York


                              /s/William M. Skretny
                              WILLIAM M.  SKRETNY
                              United States District Judge